THE SULLIVAN COUNTY RAILROAD vs. THE CONNECTICUT RIVER LUMBER COMPANY ET AL.

First Judicial District, Hartford, January Term, 1904.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

Any judgment which has been either fraudulently obtained or so improvidently entered that it is against equity and good conscience to make claim under it may be set aside at a subsequent term, upon the application of any person aggrieved and due notice to all the parties to the record. This remedy is not confined to the parties to the suit, but is open to any one whose legal or equitable rights were directly invaded by the judgment.

Creditors of a corporation who had no knowledge of the pendency of proceedings for its dissolution, and were intentionally prevented from receiving notice thereof by those who were conducting the winding-up suit, are aggrieved by a judgment dissolving such corporation while it has outstanding liabilities and owns property or rights of action which are applicable to their payment.

In the present case the winding-up suit was ordered by the directors and prosecuted by the president of the corporation, who intentionally concealed from the court and the receiver the fact that the plaintiff had a large claim against it, in consequence of which the

receiver failed to send any notice to the plaintiff of the limitation of time for presenting claims, and the corporation was wound up and dissolved before the plaintiff learned of what had been done. *Held* that although the president's concealment was not found to have been fraudulent, yet it was clearly inequitable and against good conscience, and afforded a sufficient reason for opening the judgment of dissolution upon the application of the plaintiff.

On such an application it is unnecessary for the creditor or claimant to do more than prove that he has a *bona fide* demand, which is a proper subject for judicial investigation and determination in appropriate proceedings; and therefore a finding that a valid claim was established and exists goes beyond the issue and will not prevent the receiver from disallowing the claim, if thereafter presented to him, should he, upon full investigation, deem it unfounded.

Notwithstanding the dissolution of a corporation by judicial decree, those really interested in it—its members or its creditors—can always rely upon obtaining adequate protection from the courts. So long as the control of the court over the winding-up proceedings continues according to the ordinary course of judicial procedure, so long it may open and set aside the judgment of dissolution for sufficient cause duly shown, and at the same time revive the corporation for the purpose of enabling it to be wound up properly.

One corporation which has transferred all its assets to another, upon the agreement of the second to pay the debts of the first, can proceed in equity to compel the performance of the agreement; and that right constitutes an asset which its creditors can pursue in equity. If it has been improperly dissolved, the reopening of the judgment of dissolution, so that the company or its receiver may enforce the agreement for the benefit of its creditors, is an appropriate remedy.

While a surety cannot sue the principal debtor, at law, until he has been damnified, if he has, as part of the contract of suretyship, put all his property in the principal's hands, he may have relief in equity, should the latter, while retaining the property, avoid payment of the debt in violation of the rights of the creditor.

In determining the sufficiency of a complaint to support a judgment, interlocutory rulings under which it may have been remoulded are immaterial.

Judges, as well as juries, when trying issues of fact, can find facts by inference from other facts.

A plaintiff cannot be said to have been guilty of laches, merely because he made a natural and excusable mistake in originally suing the wrong party.

Argued January 6th—decided March 3d, 1904.

Suit to open a decree of the Superior Court in Hartford

County dissolving the Connecticut River Manufacturing Company, and to set aside certain of the interlocutory orders leading up to it, brought to and tried by said court in that county, *Ralph Wheeler, J.*, after a demurrer to the amended complaint had been overruled (*Roraback, J.*); facts found and judgment rendered for the plaintiff, and appeal by the defendants. *No error.*

The following facts, among others, appeared upon the record or were found by the Superior Court: —

The Connecticut River Manufacturing Company was incorporated under the laws of this State, in 1891, and soon afterwards bought certain lumber mills of the Connecticut River Lumber Company, another Connecticut corporation, and went into the business of cutting logs on land of the latter company in New Hampshire and Vermont, driving them down the Connecticut River, and turning them into lumber at the mills. This driving and manufacturing business had previously been done by the lumber company, and the two organizations were practically one company, with the same managing officers and nearly the same directors.

In June, 1897, the manufacturing company, by its negligence in driving logs down the river, and allowing an extraordinary quantity of them to be accumulated against the piers of a bridge of the plaintiff, which crossed the river between New Hampshire and Vermont, caused substantial damage to the bridge.

In December, 1897, negotiations which had been in progress for two months, looking to the formation of a new company to take over the business both of the lumber and the manufacturing company, were concluded, and a contract was made between the two latter by which the manufacturing company sold out all its property to the lumber company, and agreed to wind up its affairs and take measures to procure its dissolution; and the lumber company agreed " to assist in every reasonable way in the winding up and termination of the manufacturing company," and " to pay at maturity all the just debts and liabilities of the manufacturing company, and to indemnify it against and hold it

harmless from all claims, demands, debts, dues, and damages of every name, nature, and description, and, further, to purchase from every holder of any shares of stock in the manufacturing company all his stock, at such price as may be agreed upon, not exceeding par; or, if no such price can be agreed upon, then to pay to the manufacturing company, for the benefit of all stockholders whose shares have not been so purchased, a just proportion of all the proceeds of the said property remaining after the payment of the said debts and liabilities, which the manufacturing company will divide *pro rata* among the holders of such outstanding shares." At this time the lumber company owned five eighths of the stock of the manufacturing company, and by December 2d, 1899, it had acquired the rest of it, and had also received conveyances of all the property of the manufacturing company.

On December 2d, 1899, both companies brought an application to the Superior Court for Hartford county, alleging that the manufacturing company had in November, 1899, voted to wind up its affairs and dissolve; that it had for a long time past abandoned its business, and now had no assets; and that more than a third of its capital stock was owned by the lumber company; and asking the court "to appoint a receiver of said Connecticut River Manufacturing Company, and to limit a time for all creditors of said Connecticut River Manufacturing Company to present their claims to said receiver, and to decree that all claims not so presented shall be forever barred, and order said receiver to give notice of such limitation to all known creditors of said Connecticut River Manufacturing Company, and that this court will pass a decree dissolving said corporation, and make such other and further orders in the premises as shall to justice and equity appertain."

The prior conveyances of the property of the manufacturing company had been made pursuant to a purpose on the part of each company to prevent it from coming into the hands of a receiver of the manufacturing company.

This property was worth over half a million dollars over and above all debts and liabilities of the manufacturing company.

The agreement of December, 1897, and all prior negotiations, were made and conducted in good faith and with no purpose on the part of either company to prejudice the rights of the plaintiff or of any creditor of the manufacturing company. Up to the date of this agreement, one Van Dyke was president of each company. Immediately prior to its execution he resigned these offices, and successors were elected, who thereupon executed the contract respectively in behalf of each company, and immediately afterwards resigned, Van Dyke being then, on the same day, re-elected to both offices, and accepting and retaining the same until the dissolution of the manufacturing company. He has always continued since his re-election, to be president of the lumber company. That is solvent and amply able to pay all claims against the manufacturing company.

At the date of the agreement of December, 1897, Van Dyke was fully informed that an injury had been done to the plaintiff's bridge by the drive of logs belonging to the manufacturing company, and that the damage to the plaintiff growing out of that injury was very great. There is no direct evidence that any other officer of the manufacturing company was at that time so informed, but as a fair and just inference from all the facts in evidence it was found that other officers of the company were so informed, and that it was contemplated by the officers of said company that a claim might be made against the manufacturing company for such damage, by the plaintiff.

In February, 1898, the plaintiff brought suit in New Hampshire for such damage, against the lumber company and Van Dyke. It sued them by mistake, having been informed and believing that the lumber company owned the logs which struck the bridge, and was then driving them, and being ignorant of the existence of the manufacturing company until after it had been dissolved. It first learned

that it owned and was driving these logs from testimony given in the New Hampshire suit by Van Dyke, on September 26th, 1900. This action was brought in December, 1900.

During the whole time of the pendency of the dissolution proceedings, the existence of the plaintiff's claim against the manufacturing company was known to Van Dyke, who was president of the lumber company and also of the manufacturing company, but he intentionally concealed the existence of said claim from the court in which the dissolution proceedings were pending, and from the receiver; and no notice of the time limit for the presentation of claims against the Connecticut River Manufacturing Company was ever sent to the applicant by any one, and the applicant never knew of the existence of the proceedings for the dissolution of said corporation, nor that it was dissolved, until several months after the decree of dissolution was passed.

*Charles E. Perkins, Orville D. Baker* of Maine, and *Irving W. Drew* of New Hampshire, for the appellants (defendants).

*John R. Buck, John H. Albin* of New Hampshire, and *John H. Buck,* for the appellee (plaintiff).

BALDWIN, J. Any judgment which has been either fraudulently obtained, or so improvidently entered that it is against equity and good conscience to make claim under it, may be set aside at a subsequent term, upon the ap-

Just before argument Mr. Buck, the senior counsel for the plaintiff (appellee), called the attention of the court to language in the brief of the appellants (defendants), which in his opinion was contemptuous, offensive and disrespectful to the trial judge, and suggested that the brief ought not to be received.

Counsel for the appellants disclaimed any intentional disrepect to the trial judge, and insisted that the words objected to were but an illustrative way of asserting that certain of his conclusions were absolutely without evidence.

After a short consultation the court announced that the language on pages 129, 130 and 131 of the appellants' brief was impertinent and disrespectful both to the lower court and to the Supreme Court of Errors, and ordered these pages to be stricken from the brief.

plication of any person interested and aggrieved, and due notice to all parties to the record. The remedy is not confined to parties to the suit. It is open to any one whose legal or equitable rights were directly invaded by the judgment. *Tyler* v. *Aspinwall*, 73 Conn. 493, 499.

General Statutes, § 3351, empowers the Superior Court, under certain conditions, to wind up and dissolve any business corporation, at the instance of shareholders owning not less than one tenth of its capital stock. In 1899 the Connecticut River Lumber Company, then owning more than one tenth of the capital stock of the Connecticut River Manufacturing Company, a corporation located in Hartford county, united with it in an application to the Superior Court in that county, under this statute. No others were made parties, and no order of notice was procured. Three days later, on an *ex parte* hearing, the allegations in the application were found by the court to be true, a receiver was appointed, and a time limited for the presentation to him of claims against it. He was directed to give notice of this limitation of time by an advertisement published for four weeks in a Hartford newspaper. The advertisement was properly given. No claims were presented, and the receiver found no assets of the company. His returns of all these facts, made on April 12th, 1900, a few days after the time limited had expired, having been accepted and found true by the court, final judgment, dissolving the corporation, was rendered on the same day.

If in fact the Connecticut Manufacturing Company had, on that date, any valuable property or rights of action, and was under a liability to any person who, by reason of any intentional act or omission of the plaintiffs in the action in which those proceedings were had, had no knowledge of its pendency, it is evident that such person was aggrieved by the judgment. He would not, indeed, be a party to the action, and aggrieved as such. His grievance would be that he was not made a party to the action, nor given any opportunity to protect, by becoming such, interests of his which it might directly affect.

The proceedings, under our statutes, if the judgment stands, constitute a bar to any claim against the Connecticut Manufacturing Company, which the plaintiff may have. They also put that company out of existence, and so preclude it from enforcing any cause of action in its favor. The plaintiff alleges, and the trial court has found, that the manufacturing company had a valid cause of action against the lumber company to compel the payment of all legal claims existing against it, by that company. It is also found that the president of the lumber company and of the manufacturing company knew that the plaintiff had a claim for substantial damages against the manufacturing company at the time when the winding-up suit was instituted, and intentionally concealed its existence from the court and the receiver. By a vote of the directors of the manufacturing company he had been directed to cause that suit to be brought, for the expressed purpose of procuring its dissolution, and causing its debts to be paid and its remaining assets distributed among its shareholders. For what he did and said, while acting under this authority, in directing the course of the suit, each of the companies of which he was the president is justly responsible. The receiver naturally applied to the officers of the manufacturing company for information as to the existence of creditors. The concealment from him of the circumstances out of which the plaintiff's claim had arisen, while not found to be fraudulent, was obviously inequitable and against good conscience. Had they been made known to the receiver, it would have been his duty to mail notice of the limitation of time for presenting claims, to the plaintiff, and presumably this would have been done. Not having been made known to him by those who should have made them known and who controlled the cause, the judgment in the cause was improvidently entered under a misapprehension of fact on the part of the court, wrongfully induced by their silence as to a matter concerning which it was incumbent on them to speak.

There are 189 assignments of error, and the printed record on appeal covers over 2,200 pages. Most of the ex-

ceptions taken relate to questions pertaining to the finding
that the plaintiff had, at the date of the judgment appealed
from, a valid claim against the manufacturing company for
substantial damages. This was made after a full hearing
occupying several weeks, as to all the circumstances lead-
ing up to the injury to the bridge.

It was unnecessary for the plaintiff to do more than to
satisfy the court that it had a claim for substantial damages,
which was a proper subject for judicial investigation and
determination in appropriate proceedings. If it had any
valid claim at all, there could be no dispute that it was one
for a considerable sum. It was enough to show that it had
an interest in a bridge which had been partly destroyed by
force of an unusual rush of water caused by an extraordinary
jam of logs belonging to the manufacturing company, and
that it asserted in good faith that the company was negli-
gent in allowing such a jam to accumulate at such a place.
Whether the bridge was a lawful structure, and whether that
company was in fact responsible for the injury to it, were
questions to be settled on another occasion. The hearing
on the present application was simply for the purpose of as-
certaining if an opportunity ought to be given to raise these
questions where they could be so settled. It called for no
further inquiry into the merits of the plaintiff's claim than
would have been requisite if, before the judgment of dis-
solution but after the time limited for the presentation of
claims had expired, it had appeared and moved to have fur-
ther time allowed for that purpose.

The finding, therefore, of the trial court, which is embodied
in the judgment appealed from, that a valid claim for substan-
tial damages to compensate the plaintiff for an injury done
to its bridge by the manufacturing company on June 10th,
1897, was established and exists, legally imports nothing
more than that sufficient proof of the existence of such a
claim was made to support the application to open the judg-
ment in the winding-up suit, and the orders leading up to it,
so far as they barred the presentation of the claim to the
receiver. It concludes the parties to the present action to

that extent only, and leaves the receiver free to disallow the claim, if presented to him, should he, on full investigation, deem it unfounded.

It follows that most of the reasons of appeal are immaterial, and require no further consideration.

It is contended that there was error in the declaration in the judgment that the manufacturing company is " in existence, the same as before said decree of dissolution was passed."

The analogy between the death of a natural person and the dissolution of an artificial person is an imperfect one. Behind the artificial person stand and survive the other persons, natural or artificial, who really composed it.

The artificial person known as the Connecticut River Manufacturing Company never existed save in contemplation of law. When it sought dissolution by means of a judicial action, and assumed the position of an ordinary suitor, it became entitled to all the benefits and subject to all the burdens that are incident to that position. A corporation which resists unsuccessfully a stockholder's application for its dissolution could not be precluded by the judgment from appealing for errors in law, notwithstanding the judgment pronounced its existence at an end. It would remain in existence for the purpose of protecting itself against that judgment, the operation of which the appeal would meanwhile suspend. *Giles* v. *Stanton*, 86 Tex. 620. So if it procure a judgment of dissolution, third parties ought not to lose a remedy against it, or one which can only be enforced through it, if, as to them, that judgment is one that, in equity, cannot stand, and to open it and reinstate the corporation in life would smooth the way towards making that remedy effectual.

A corporation is called into existence and invested with the attribute of personality by the sovereign power of the State. If created for a limited term, and for that only, or if constituted subject to conditions the performance of which becomes impossible, a franchise thus expiring may be extended in duration or renewed by subsequent action on the

part of the sovereign, even if that be had after a dissolution has occurred. *Colchester* v. *Seaber*, 3 Burr. 1866 ; *Rex* v. *Pasmore*, 3 T. R. 199; *Bleakney* v. *Farmers & Mechanics Bank*, 17 S. & R. (Pa.) 64. See *Wilcox* v. *Continental Life Ins. Co.*, 56 Conn. 468, 477. This does not create a new artificial person. It is a revival of the original corporation, and a revival after it had once ceased to exist. The harsh doctrine of the common law, that the absolute and unqualified dissolution of a corporation extinguished *ipso facto* alike all its property rights and all its obligations was never received in equity. Those really interested in them—its members or its creditors—can always rely on obtaining adequate protection from the courts. Every moneyed corporation is, in a sense, a trustee for those who own its capital or have a right to look to it for security. A trust never fails for want of a trustee, and whenever necessary the State, in some form of proceeding, can and will supply one.

It follows from these principles that when the legislative power has committed to the judicial power jurisdiction to dissolve corporations by judgments rendered in winding-up proceedings, so long as the control of the court over those proceedings continues according to the ordinary course of judicial procedure, so long may it open and set aside such a judgment, for sufficient cause duly shown, and at the same time reinstate the corporation in life for the purpose of enabling that to be done properly which had been undone because done improperly. The Superior Court opened the judgment because the affairs of the manufacturing company had not been properly wound up. That they might now be properly wound up, it was within its power to revive the company and thus facilitate at once resistance to any unjust demands against it, and the enforcement of all just demands in its favor. Its right of action on the contract of the lumber company to pay all its just liabilities was, in a court of law, personal to itself. *Baxter* v. *Camp*, 71 Conn. 245, 71 Amer. State Rep. 169 ; *Morgan* v. *Randolph & Clowes Co.*, 73 Conn. 396. Since, however, by other provisions of that contract, all its property passed to the lumber company, any recovery in

such an action would be treated in equity as a recovery for the use of those in whose favor the liability might exist, and the proceeds of the judgment would be impressed with a trust to that effect. The equities attaching to this trust relation can be best worked out by putting the manufacturing company back in a position to sue for whom it may concern, should such a form of action be deemed preferable, in any case, to proceedings by the receiver. *Barber v. International Co.*, 73 Conn. 587, 593; 74 id. 652, 657.

The defendants contend that the judgment appealed from is erroneous, because the relief asked for and granted could be of no benefit to the plaintiff. Their argument is that, as between the two companies, their contract of 1899 made the lumber company the party really liable, if any one was, for the damage suffered by the plaintiff, and relegated the manufacturing company to the place of a surety; that the receiver has no rights which the manufacturing company did not possess; that a surety cannot sue until damnified; and that as the manufacturing company has not paid this damage, there can be no action to secure reimbursement.

A surety cannot sue at law until he has been damnified, but he and those for the debt to whom he is surety can have relief in equity when, as in this case, he has, as part of the contract of suretyship, placed all his property in the hands of the principal debtor, and for that cause cannot himself respond in the first instance to his creditors' demands.

It is claimed that since the plaintiff alleged in its complaint, but failed to prove, that the contract of 1897 was made with an intent to defeat the collection of its claim, the judgment is unwarranted by the pleadings. It was enough to support it that the plaintiff also alleged and did prove that the pendency of the dissolution proceedings was concealed from it by the lumber company with that intent, and that the transfers of property under the contract were made before those proceedings were instituted, in order to prevent the coming of any assets into the hands of the receiver.

This is so, notwithstanding the fact that the averments

above mentioned, which were not found true, were in part the ground on which a demurrer to the complaint was over-ruled. The complaint was sufficient without them. Nor is the judgment erroneous because these averments were put into the complaint by an amendment, to avoid the effect of a previous ruling sustaining a demurrer for want of them. In determining the sufficiency of a complaint to support the judgment, interlocutory rulings under which it may have been remoulded are immaterial.

It is further claimed that the finding that, in December, 1897, other officers of the manufacturing company besides Van Dyke knew of the existence of the plaintiff's claim against it, was made without evidence. It was a fact fairly inferable from Van Dyke's knowledge. His position as president of both companies made it his duty, before the contract between them was submitted to their boards of direction for execution, to communicate what he knew as to this claim to those acting with him in the management of the affairs of each; and the trial court was warranted in concluding that he fulfilled this obligation.

There was also sufficient ground for the inference made by the trial court that the property of the manufacturing company was conveyed to the lumber company to prevent it from coming into the hands of a receiver. It naturally had that effect, and the relations of the two companies to each other were such as to make it, to say the least, probable that they intended that result.

The defense of laches on the part of the plaintiff was properly overruled. The only substantial defendant was the lumber company. As already stated, it does not lie in its mouth to accuse the plaintiff of fault in not learning earlier of the winding-up proceedings, and there is ample evidence to support the finding that the mistake in suing the wrong party for the injury to the bridge was a natural and excusable one.

The defendants asked the Superior Court to rule that it was not the legal duty of Van Dyke to tell the plaintiff who owned and drove the logs which formed the jam against the

bridge. A ruling on this point was properly refused. It was not material whether such was or was not his duty. The question was whether, in the absence of correct information from any quarter, the plaintiff, under the circumstances of the case, had slept upon its rights.

Of the numerous exceptions taken to the finding and to refusals to find as the defendants requested, it is enough to say that there was evidence on which each finding made can be supported, and on which each of the refusals complained of could have been properly rested. The trial court could rightfully take into account the substantial identity of the lumber company and the manufacturing company, after the contract of December, 1897, had done its work. One artificial person had been virtually transfused into another artificial person, with the same head in their common president. Courts have no less power than juries to infer facts from facts, in disposing of an issue of fact.

There is no error.

In this opinion the other judges concurred.